754 So.2d 987 (1999)
Rickey Thomas CHERAMIE, Individually and as Natural Tutor of the Estates of His Minor Children, Nicholas John and Mark Christopher Cheramie
v.
CONTRACT HAULERS, INC., et al.
No. 98 CA 1399.
Court of Appeal of Louisiana, First Circuit.
September 24, 1999.
*988 Kirk A. Guidry, Baton Rouge, for Plaintiffs/Appellants, Rickey Thomas Cheramie, et al.
Camille A. Morvant, II, Thibodaux, for Defendants/Appellees, Robert Goff, Contract Haulers, Inc., And United States Fidelity & Guaranty Co.
Before: CARTER, C.J., LeBLANC, and PETTIGREW, JJ.
CARTER, C.J.
This is an appeal of a general damage award of $60,000.00 by Rickey Thomas Cheramie for personal injuries he sustained when his vehicle was rear-ended by an 18-wheeler owned by defendant, Contract Haulers, Inc.

FACTS
On February 21, 1995, Cheramie was rear-ended by an 18-wheeler driven by Robert Goff, Jr., an employee of Contract Haulers, Inc. United States Fidelity and Guaranty Company (USF & G) was the insurer for Goff and Contract Haulers, Inc. As a result of the accident, Cheramie underwent a lumbar disc removal and fusion at the L4-5 and L5-S1 levels and has been unable to work since the accident. Cheramie filed suit for personal injuries against Contract Haulers, Inc., Goff, and USF & G. Cheramie sued in his individual capacity and as natural tutor of the estates of his minor children, Nicholas John and Mark Christopher Cheramie.
The matter was tried before a jury from February 25-27, 1998. The defense stipulated that Goff was in the course and scope of his employment with Contract Haulers, Inc. and was 100% at fault in causing the accident. Accordingly, the only issue to be resolved was the amount of damages Cheramie sustained. The jury returned the following awards in favor of Cheramie:

a) Past Medical Expenses $63,256.83
b) Future Medical Expenses 3,000.00
c) Past Wage Loss 60,000.00
d) Loss of Future Earning Capacity 100,000.00
e) Past Pain and Suffering, both
 Physical and Mental, And Physical
 Disability 30,000.00
f) Future Pain and Suffering, both
 Physical and Mental, and Physical
 Disability 30,000.00
 TOTAL $286,256.83

In his only assignment of error, Cheramie argues the jury abused its discretion in awarding only $60,000.00 for past and future pain and suffering, both physical and mental, and physical disability.

DISCUSSION
The trier of fact is afforded much discretion in fixing general damage awards. LSA-C.C. art. 2324.1; Hollenbeck v. Oceaneering International, Inc., 96-0377, p. 12 (La.App. 1st Cir.11/8/96); 685 So.2d 163, 172, writ denied, 97-0493 (La.4/4/97); 692 So.2d 421. The discretion vested in the trier of fact is great, "even vast," so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corporation, 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Youn, 623 So.2d at 1260.
The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances *989 on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Youn, 623 So.2d at 1260. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award. Youn, 623 So.2d at 1261.
Ricky Cheramie was 42 years old at the time of the accident. Cheramie is a single father, who had custody of his two minor sons. He had no prior injuries or problems with his neck or back. When the accident occurred, Cheramie testified he hit the left side of his head and lost consciousness. He regained consciousness when the firemen arrived on the scene, but testified that his recollection of that time was "fuzzy." Immediately after the accident, Cheramie felt an intense burning sensation from his right groin area down to his knee. He was transported to the emergency room at St. Ann's Hospital in Raceland and released the same day. Because of the severe pain Cheramie could not return to work following the accident.
After his accident, Cheramie was seen by Dr. Richard Landry, who speculated Cheramie had a fractured pelvis. Cheramie sought a second opinion from Dr. Kenneth Adatto a month after the accident. He still complained of the intense burning sensation in his right leg, severe pain in his lower back and neck, and bad headaches. Dr. Adatto noted objective findings of spasm in Cheramie's neck and lower back on his first office visit on March 21, 1995. The x-rays taken by Dr. Adatto indicated early arthritis that predated the accident, a small spur at C5, and a narrowing of a higher disc at L2-3. However, Dr. Adatto did not think these abnormalities were causing Cheramie's pain since his pain was located below L2-3. An MRI taken in April 1995, indicated abnormal discs at the L4-5, L5-S1 area, and a later CT scan presented a clearer picture of a lesion at L5, which Dr. Adatto attributed to Cheramie's motor vehicle accident.
Dr. Adatto testified that because Cheramie was still fresh from injury, he treated him with conservative care. However, Cheramie did not respond to the conservative care and in June 1995, Dr. Adatto brought up the possibility of surgery. Because his pain was not improving, Cheramie had his L4-5 and L5-S1 discs completely removed and replaced with bone plugs on September 13, 1995. For six months after his surgery, Cheramie wore a turtle shell brace and a bone stimulator to protect his back and promote the fusion.
One month after surgery, Cheramie reported that his back pain had improved. However, Dr. Adatto noted Cheramie had radiculopathy, which he explained as nerve pain radiating from his neck into his arm, at the C6-7 level on his right side. The radiculopathy was also present on Cheramie's second post-operative visit in December in addition to some numbness on Cheramie's left side. By March 1996, Cheramie reported that his leg pain was completely gone, but he still complained of recurrent back pain, neck pain radiating into his arm, and headaches.
In June 1996, Cheramie told Dr. Adatto that his back pain was better and that he could get relief from it through over-the-counter medications. According to Dr. Adatto, Cheramie had gone from narcotics to over-the-counter medicines in a relatively short time period. Dr. Adatto testified that a year after surgery, Cheramie's fusion looked solid. Dr. Adatto expected 80% relief from the surgery, but testified that he estimated Cheramie only obtained 60% relief. On June 16, 1997, Dr. Adatto noted some pain trigger points in Cheramie's low back that he previously had not detected. Dr. Adatto injected these areas with Celestone and Xylocaine.
At Cheramie's last office visit on August 25, 1997, Dr. Adatto noted the surgery had *990 helped Cheramie, but not as much as the doctor would have preferred. Dr. Adatto testified that because Cheramie was a diabetic, he had more problems than the average patient. Dr. Adatto testified that Cheramie would continue to have back and neck pain on an intermittent basis for the rest of his life.
Cheramie had complained of headaches ever since the accident. He was referred to a neurologist, Dr. Wendy Jamison. Cheramie first saw Dr. Jamison on March 30, 1995. Cheramie described his headaches to Dr. Jamison as varying in intensity, sometimes accompanied by nausea and vomiting, blurry vision, and dizziness. Cheramie also indicated that during these headaches he was very sensitive to light and preferred to be in a darkened room. Dr. Jamison initially diagnosed Cheramie with post traumatic headaches and speculated that they should not last very long.
Cheramie did not see Dr. Jamison again until June 27, 1996. According to Cheramie, the intensity of the headaches remained the same; however, the frequency had decreased. Dr. Jamison had ordered Cheramie undergo an MRI and EEG, which he did not have done until February 1997. The MRI was normal, but the EEG revealed an abnormality of intermittent bursts in Cheramie's brain waves. At that time, Cheramie reported he was experiencing two headaches a week, but no medication seemed to help.
In her trial deposition, Dr. Jamison opined that Cheramie's headaches were more of a migraine type. She indicated that people could develop migraines after a trauma, and she projected his headaches to continue. According to Cheramie, when he suffered from a headache, he had trouble concentrating and remembering.
As a result of his injuries and surgery, Dr. Adatto assigned Cheramie a 10-15% disability of the lumbar spine, which translated to a 7-8% whole body disability. He restricted Cheramie from engaging in repetitive stooping and bending, or repetitive lifting of weights of 25 to 50 pounds. Dr. Adatto defined repetitive as three or more times in an eight hour workday. Dr. Adatto also advised Cheramie to avoid sitting or standing in the same position without moving around every 45 minutes, plus or minus 15 minutes. Dr. Adatto testified that Cheramie could no longer engage in the type of work he had performed prior to his accident and would have to do either light work within his restrictions or sedentary work. With these restrictions Cheramie can not return to the heavy labor he had performed prior to his accident.
Prior to his accident, Cheramie testified he enjoyed outdoor activities such as hunting and fishing with his three sons. They would make an annual hunting trip to Alabama; however his back condition prevented him from doing that. He testified he often fished with his sons, but he felt he could no longer do that either. He coached his youngest son's, Mark's, football team, and also taught Nick, who played high school football, blocking techniques.
Because of his headaches, Cheramie testified he could no longer help Mark with his homework every night. Cheramie testified that prior to his accident he felt especially close to his sons, as if they were brothers or friends rather than a father and sons. However, due to his migraines and limits on physical activities, he felt he could not support and help his children as he could prior to the accident. Cheramie testified that often times his sons would approach him with a problem or question and he could not give them the attention or support that he had given them in the past. According to Cheramie, his relationship with his children was weakened. He also testified that he worried as to how he would take care of his younger sons, Nick and Mark.
Rickey Cheramie, Jr., and Nick Cheramie both testified that when their father had a headache, he would go into his room and lay down and was not able to do anything. They testified they observed *991 their father in pain frequently and knew he could no longer do the physical activities with them as he had prior to the accident.
The limitations placed on Cheramie after his accident prevent him from engaging in any of the activities he enjoyed prior to his accident. It is evident from the record that the injuries sustained by Cheramie have had a drastic affect on his life. Considering Cheramie's age and the fact he will continue to suffer from intermittent back pain and migraine headaches for the rest of his life, we conclude that the jury abused its discretion in awarding Cheramie $60,000.00 in general damages.
Only after it is determined there has been an abuse of discretion, is a resort to prior awards appropriate, and then for determining the highest and lowest point which is reasonably within that discretion. Coco v. Winston Industries, 341 So.2d 332, 335 (La.1976). Our review of prior damage awards for injuries comparable to what Cheramie has sustained reveals an award of $175,000.00 for a 49-year-old man, who was a manual laborer who injured his back in an accident. Surgery was performed on two discs, which relieved most of his pain; however, like Cheramie, the plaintiff could never return to manual labor again. Caro v. Louisiana and Delta R.R., Inc., 94-0059, p. 4 (La. App. 1st Cir.11/10/94); 646 So.2d 435, 437, writ denied, 94-3008 (La.2/3/95); 649 So.2d 408.
We also note an award of $25,000.00 to a plaintiff suffering from severe headaches, neck pain, and blurred vision after being struck in the head with the cross beam of a swing. Sinor v. National Casualty Co., 633 So.2d 720, 723 (La.App. 1st Cir.1993). Thus, we find the lowest reasonable award of general damages that was within the jury's discretion would have been $200,000.00. We also note the case of Usé v. Usé, 94-0972, p. 14-15 (La.App. 1st Cir.4/7/95); 654 So.2d 1355, 1364, writs denied, 95-1834, 95-1879 (La.11/13/95); 662 So.2d 468, wherein this court raised an award of general damages to the lowest amount reasonably within the trier of fact's discretion which was found to be $200,000.00. The plaintiff at issue in Usé had undergone a lower lumbar discectomy and fusion and was assigned a 10-15% disability rating with the same work restrictions as Cheramie. In the instant case, the jury only awarded Cheramie $60,000.00 in general damages. Accordingly, we raise Cheramie's general damage award to the lowest acceptable amount of $200,000.00.

CONCLUSION
For the above and foregoing reasons, we increase the award for Cheramie's past and future pain and suffering, both physical and mental, and physical disability to $200,000.00. Accordingly, the total damages award due to Rickey Thomas Cheramie by defendants, Robert Goff, Jr., Contract Haulers, Inc., and United States Fidelity and Guaranty Company is $426,256.83. All costs of the appeal are assessed against Robert Goff, Jr., Contract Haulers, Inc., and United States Fidelity and Guaranty Company.
AMENDED AND RENDERED.